| | | |
|---|---|---|
| **J.A., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 2:18-cv-00043** |
| **v.** | ) | **Chief Judge Crenshaw** |
| | ) | **Magistrate Judge Brown** |
| | ) | |
| **SMITH COUNTY SCHOOL DISTRICT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

To: The Honorable Waverly D. Crenshaw, Jr., Chief United States District Judge

## REPORT AND RECOMMENDATION

Pending before the Court is Plaintiffs' motion for preliminary injunction (Docket Entry No. 7). For the reasons stated below, the Magistrate Judge **RECOMMENDS** that Plaintiffs' motion be **GRANTED** and that J.A. be placed in kindergarten at New Middleton Elementary School with a paraprofessional properly trained in dealing with Down Syndrome children and for the District to conduct a Functional Behavior Assessment ("FBA") and implement a Behavior Intervention Plan ("BIP").

## I. INTRODUCTION

Plaintiffs, J.A. and his parent and next friend, B.P., filed this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*., Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq*., and Title II of the Americans with Disabilities Act ("ADA"), with amendments, 42 U.S.C. § 12182, against Defendant, Smith County School District. Plaintiffs assert that Defendant's decision to move J.A., who has Down Syndrome, from a classroom with non-disabled children to a segregated classroom primarily comprised of children with disabilities, without first considering additional supports and services, was more restrictive than necessary and

therefore violated J.A.'s right to receive a free appropriate public education ("FRAPE") in the least restrictive environment ("LRE").

## II. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiffs filed for due process on December 4, 2017. (Docket Entry No. 7-2, Joint Stipulations, at ¶ 14). On December 12, 2017, J.A. withdrew from New Middleton Elementary School ("NMES") . *Id.* at, ¶ 15. Plaintiffs' due process complaint was heard by a State administrative law judge ("ALJ") who conducted a due process hearing on May 1-2, 2018, which resulted in an unfavorable decision against Plaintiffs. (Docket Entry Nos. 6-1 and 6-2; Docket Entry No. 7-4). Plaintiffs subsequently filed this action in federal court on May 21, 2018. (Docket Entry No. 1). On May 24, 2018, Plaintiffs filed their motion for preliminary injunction. (Docket Entry No. 7). On July 11, 2018, the District Judge referred this action to the Magistrate Judge to enter a scheduling order for the management of the case, to dispose or recommend disposition of any pretrial motions under 28 U.S.C. §§ 636(b)(1)(A) and (B), and to conduct further proceedings, if necessary, under Rule 72(b), Fed. R. Civ. P., and the Local Rules of Court. (Docket Entry No. 24). On July 23, 2018, the Magistrate Judge conducted a lengthy telephone conference with the parties and set a hearing for September. (Docket Entry No. 27). The parties agreed that the hearing would encompass both the preliminary injunction, as well as a hearing on the merits of the action. *Id.* On September 17, 2018, the Magistrate Judge held an evidentiary hearing, and the parties filed their proposed findings of fact and conclusions of law on October 9, 2018. (Docket Entry Nos. 32 and 36-37).

## A. ADMINISTRATIVE HEARING

### 1. Testimony of Wendy Cond

J.A. was born on August 17, 2012. (Docket Entry No. 7-2, at ¶2). J.A. was diagnosed with Down Syndrome and is eligible for special education with Smith County School District under the category of Developmental Delay. *Id*. at ¶ 1. J.A.'s first Individualized Education Program ("IEP") meeting for preschool was held on May 19, 2017. *Id*. at ¶ 3. At the meeting, J.A.'s mother was told that after the first nine weeks the IEP would be reexamined based upon how J.A. was progressing in the regular education classroom. (Docket Entry No. 6-1, pp. 43, 53, 136).[1] J.A. was placed in the regular education classroom at New Middleton Elementary School ("NMES") and began preschool there on August 7, 2017. (Docket Entry No. 7-2, at ¶¶ 4-5).

Wendy Cond, who had eleven years of experience teaching pre-kindergarten ("pre-K"), taught the regular education pre-K class at NMES for the 2017-2018 school year. (Docket Entry No. 6-1, at pp. 23, 25). Cond had never taught special education, did not have special education training and had never taught a child with Down Syndrome. *Id*. at pp. 26, 104-05. Cond's class consisted of twenty children, including J.A. *Id*. at pp. 25-26. Cond had a full-time paraprofessional to help her with the children (1 to 10 ratio) in the classroom. *Id*. at pp. 28-29. The pre-K curriculum consists of reading, writing, language, math, science, social, studies, creative arts, and PE/health. (Docket Entry No. 7-2, at ¶ 6).

The District provided J.A. thirty minutes each day of "pull out" special education academic services, 30 minutes each week of occupational therapy, 30 minutes each week of physical therapy,

---

[1]Unless otherwise stated, citations are to the Court's ecf pagination. References to actual transcript pages are denoted with a "p." or "pp.".

and 20 minutes twice per week of speech language therapy. *Id*. at ¶ 7. Cond testified at the May 1, 2018 administrative hearing that J.A.'s May 2017 IEP plan did not contain any academic goals for math, science or social studies. (Docket Entry No. 6-1, at pp. 36, 71). J.A.'s goals were mainly in the area of fine and gross motor skills. *Id*. at p. 37. Cond explained that no teacher had seen J.A. prior to the May I.E.P. meeting and because J.A. was nonverbal the educators wanted to see what J.A. could do once school started. *Id*. Nevertheless, Cond did try to teach J.A. math, social studies, and science. *Id*. at p. 146. However, there was nothing in the I.E.P. for charting J.A.'s rate of progress in these subjects. *Id*. at pp. 147-48.

Cond testified that, after having a discussion with the principal, Shawn Frye, about J.A.'s reoccurring behavioral problems, she began keeping a running log of J.A.'s behavioral problems so that she would know how to address them. *Id*. at pp. 53-54. J.A.'s behavioral problems consisted of him licking objects, hitting, throwing things, climbing, having toilet training accidents, putting things in his mouth, and running away from adults. *Id*. at pp. 54-56, 58, 77, 137-39, 141-42, 149, 151. The log entries ran from August 10, 2017, through sometime in November 2017. *Id*. at p. 59. Cond did not give a copy of her log to J.A.'s parents, but testified that she would tell J.A.'s mother about what happened at school or would call her if J.A. had an accident. *Id*. at p. 54. Despite J.A.'s behavioral problems, the District did not conduct a Functional Behavior Assessment ("FBA") on J.A. or provide J.A. with a Behavior Intervention Plan ("BIP"). (Docket Entry No. 7-2, at ¶¶ 8-9).

Cond also informed J.A.'s mother about how J.A. was performing in school through the mid-nine week and nine week progress reports. (Docket Entry No. 6-1, at p. 61). J.A.'s first mid-nine week progress report reflected that "most of the time" J.A. "share[d] and t[ook] part in play activities," "t[ook] part in art activities," "ha[d] good cafeteria behavior," "[was] a good helper," and

"ha[d] positive school behavior." (Docket Entry No. 7-5, at 1). "Some of the time" J.A. "particpate[d] in group activities," [sat] quietly during circle time," "work[ed] and play[ed] well with others," and "listen[ed] and follow[ed] directions." *Id*. J.A.'s second mid-nine week progress report reflected that J.A. was having difficulty writing his name, saying the alphabet, naming all letters in his name and identifying it, counting to 30, and identifying colors, with the exception to the color blue. *Id*. at 2. J.A. also was having difficulty recognizing letters. *Id*. Cond testified that J.A. did not have grades for math, social studies and science because "[h]e wasn't able to tell me or show me anything with that," and "[h]e had difficulty" in those areas of learning. (Docket Entry No. 6-1, at pp. 131-32). As to the goals listed on J.A.'s IEP plan, the school anticipated him meeting these stated goals by the end of the IEP term in May 2018. *Id*. at p. 74.

On October 25, 2017, another IEP meeting was held. (Docket Entry No. 7-2, at ¶ 11). At this meeting, J.A.'s misbehaviors were discussed, but there was no discussion of conducting an FBA and creating a behavior plan. (Docket Entry No. 6-1, at pp. 74-75, 77). The items "FBA (If appropriate)" and "Behavior Plan (if appropriate)" labeled on J.A.'s IEP were stricken with a line through them by the District. *Id*. at p. 76. The District proposed moving J.A. to a comprehensive development class ("CDC"), a special education class located at Carthage Elementary School ("CES"), which was approximately thirty minutes from J.A.'s home. *Id*. at pp. 78-79, 101; Docket Entry No. 7-2, at ¶ 11. Cond explained that the CDC class at CES was an "inclusion class," which contained non-disabled and disabled students in a smaller classroom, with three teachers in a smaller group setting. *Id*. at p. 79. J.A.'s mother did not agree with the proposed change in placement and requested that J.A. be provided with a one-on-one aide that could help with his behavior. *Id*. at pp. 77-78, 154. According to Cond, J.A.'s mother made statements at the October IEP meeting that

reflected that she did not want J.A. to attend CES because of a community rivalry between Gordonsville, where NMES is located, and Carthage. *Id*. at pp. 142-44, 152-53. Although J.A.'s mother also stated that she wanted J.A. in a regular education classroom with an aide, Cond believed that the "rivalry was the biggest part of it." *Id*. at pp. 152-53. The District declined to provide J.A. with a one-on-one aide in the regular education classroom because it believed it "would be too restrictive." (Docket Entry No. 7-2, at ¶ 10).

An additional IEP meeting was held on November 20, 2017. *Id*. at ¶ 12. The District again recommended that J.A. be moved to CES, but J.A.'s mother objected because NMES was closer and would offer peers that J.A. could imitate. *Id*.; Docket Entry No. 6-1, at pp. 82-83. J.A.'s mother reiterated that she wanted J.A. to be assigned an aide to help prevent some of J.A.'s behavioral problems in the classroom. *Id*. at pp. 87-88, 102. The District believed that J.A. needed something more because an aide would only help in preventing bad behaviors rather than helping his learning. *Id*. at pp. 87, 140, 144-45. Cond admitted that there was not any data presented at the IEP meeting showing how J.A. would perform with a one-on-one aide, but stated that the special education teacher, who worked with J.A. for 30 minutes a day and helped with his behaviors, had to spend time stopping J.A.'s behaviors and rerouting them, and Cond opined that a one-on-one aide would essentially have done the same thing for the full day. *Id*. at pp. 44-45, 91, 138.

J.A.'s November 20, 2017 IEP indicated that J.A.'s behaviors impeded his learning. *Id*. at pp. 93-94. Cond initially testified that the District was willing to address J.A.'s behaviors by conducting a functional behavior assessment and providing a behavior intervention plan, but that "we all felt that [J.A.] needed to be in a smaller group setting." *Id*. at p. 94. When asked, "Were you willing to give him the assessments, an opportunity to see if they worked in your class, before

moving him to a different school?", Cond answered, "We didn't discuss that, no." *Id*. at pp. 94-95.

Cond was further asked, "[D]id you all offer the child . . . the opportunity to have the assessments

done and see if they could work in your classroom?", to which she responded, "I don't believe it

would have been in my classroom, no." *Id*. at p. 95. As to the District's consideration of providing

J.A. with additional supports at NMES through accommodations, assertive technology, or additional

special education services, Cond testified that they tried putting a weighted vest on J.A. to help with

his misbehaviors, but that the vest was not effective. *Id.* at pp. 109-10. Cond also testified that she

used iPads in her classroom and technology used with the computer. *Id*. at p. 110.

J.A.' s November IEP was to run from November 20, 2017, to May 19, 2018. *Id*. at p. 82.

J.A.'s new IEP did not have any math, science, or social studies goals. *Id*. at pp. 84-85, 96, 126-27.

The IEP documentation from the November 20, 2017 meeting shows that the District marked through

the area for addressing present levels of performance for reading and mathematics and replaced them

with speech and occupational therapy goals. *Id*. at pp. 102-03. The November IEP recommended

that J.A.'s academics would be taught in a special education setting by a special education teacher

four times per week, seven hours per session, for a total of 28 hours per week. *Id*. at pp. 96-97. The

IEP provided that J.A. would be placed in an integrated self-contained pre-K at CES. *Id*. at pp. 97-

98. Cond explained that her regular education pre-K class is considered a self-contained classroom

whereas an integrated self-contained classroom is comprised of disabled and non-disabled students.

*Id*. J.A.'s mother did not sign the IEP. *Id*. at p. 93.

The parents' advocate, Alecia Talbott, was present at the November IEP meeting and

recommended that J.A. receive a functional behavior assessment with real data and to try a new plan

until February or March 2018 to see how J.A. performed in class. *Id*. at pp. 103, 106. According

to Cond, Talbott had not observed J.A. in Cond's classroom.  *Id*. at pp. 133-34.  Cond believed that J.A. needed to be in a smaller classroom because he was "overwhelmed by everything going on" in her classroom.  *Id*. at p. 139.  Cond testified that the District was willing to do an assessment, but not at NMES.  *Id*. at pp. 106-07.  Instead, the District recommended CDC placement at Carthage.  *Id*. at p. 107.

On December 18, 2017, six days after J.A.'s mother withdrew him from NMES, a resolution meeting was held between the parties regarding Plaintiffs' December 4, 2017 due process complaint.  *Id*. at pp. 115-16.  At the meeting, Eric Swann, Smith County's school psychologist, stated that they were "100% on board" with an FBA and a behavior plan and open to training.  *Id*. at pp. 107, 116-17, 202; Docket Entry No. 7-7.  However, Swann believed that the Carthage elementary staff was more highly trained and experienced to meet JA's needs, that J.A. would receive more attention at CES, and that an aide would segregate J.A. more.  *Id*. at pp.  116-18; Docket Entry No. 7-7.  Swann stated that the District would draw a line on placement and on the request for a one-to-one aide.  Exhibit 13 and 15 Recording of Resolution Meeting.  Emmerson Stockton, the director of special education, stated that "[n]o student in Smith County ha[d] a full day aide" and believed that "the CDC classroom [would] move at [J.A.'s] rate" as the general education class had "to continue moving to meet standards."  *Id*. at pp. 117, 118, 188; Docket Entry No. 7-7; Exhibit 13 and 15 Recording of Resolution Meeting.  J.A.'s mother's position was that the same supports could be provided in the general education class.  *Id*. at pp. 118-19; Docket Entry No. 7-7.

### 2. Testimony of Alecia Talbott

Alecia Talbott, the executive director for the Down Syndrome Association of Middle Tennessee, testified that the Down Syndrome Association ("DSA") provides education and support

to families and caregivers who have children with Down Syndrome, employers, the community, business owners, and educators. *Id*. at p. 157. Talbott testified that the DSA provides free training to educators at various levels, including paraprofessionals. *Id*. at pp. 158-59. Talbott testified that a paraprofessional's role is not that of a babysitter, but to help the child be as independent and as successful as possible. *Id*. at p. 160. Talbott testified that she attended some of the IEP meetings with J.A.'s mother and offered training to the District, but that no one from the Smith County School System contacted her or went to any trainings. *Id*. at p. 162.

Based upon the discussion at the IEP meeting about J.A.'s misbehaviors, Talbott recommended that J.A. receive a functional behavior assessment, explaining that an FBA "analyzes the child's behavior across different settings, different times of the day, across a number of weeks," seeking to find out why the child is engaging in that behavior, or what's maintaining that behavior. *Id*. at pp. 167-68. Talbott further testified that an individualized education plan includes supports and services. *Id*. at p. 173.

### 3. Testimony of J.A.'s Parents

At the administrative hearing, J.A.'s mother, B.P., denied that the community rivalry was the reason she did not want J.A. to be placed at CES, stating that she would not object to his placement at CES as long it provided the least restrictive environment in a regular education class with supports and services. *Id*. at pp. 174-75. J.A.'s mother testified that she was never shown Cond's behavior log and was only informed about his behaviors during the first two weeks of school. *Id*. at pp. 176-77. J.A.'s mother testified that she was never offered having an aide and behavior plan at NMES. *Id*. at p. 177. J.A.'s mother understood the term CDC to refer to children who have disabilities. *Id*. at p. 178. J.A.'s mother testified that after being told at the November IEP meeting that J.A. would

not have an aide and an FBA at NMES and then seeing a video on NMES's Facebook page, showing J.A.'s classmates performing a dance routine while J.A., not being assisted by a teacher in participating, just stood there and watched, she decided to withdraw J.A. from NMES. *Id*. at pp. 178-181, 185. As a result, she placed J.A. in camp at Dynamic Therapy on Mondays and Fridays for three hours a day where he received occupational, physical and speech therapy, and at Mother's Day Out, which was more of a preschool setting with non-disabled students, on Tuesdays and Thursdays for five hours a day. *Id*. at p. 181. There was not another public school option where they lived. *Id*. at p. 194. J.A.'s mother also involved J.A. in community activities such as being a model in pageants, participating in homecoming, and playing T-ball. *Id*. at pp. 195-97.

J.A.'s mother further testified that she visited CES with the director of schools, Barry Smith, to observe how the classroom worked. *Id*. at p. 187. According to J.A.'s mother, they did not discuss the community rivalry between New Gordonsville and Carthage. *Id*. at pp. 187-88. J.A.'s mother also denied stating that if CES's special education classroom were in Gordonsville she would be fine with it. *Id*. at p. 198. J.A.'s mother would not object to a twenty mile difference in placement if she could find a premier educational program that she believed was perfect for J.A. *Id*. at 192-93. J.A.'s mother stated that she did not know that if she had left J.A. at NMES and filed her due process complaint that his services would have stayed the same. *Id.* at p. 193.

J.A.'s father, B.A., testified that community rivalry did not play a role in where J.A. was educated and that if J.A. could be included with non-disabled peers in Carthage that would be acceptable. (Docket Entry No. 6-2, at pp. 265-67). J.A.'s father testified that he would be willing to enroll J.A. in another year of preschool if J.A. were provided an aide. *Id*. at p. 268. J.A.'s father

did not attend the IEP meetings in May and October, but was present at the one in November. *Id*. at p. 270.

### 4. Eric Swann

Eric Swann, a school psychologist with Smith County, testified that he never heard anyone from the District offer the opportunity for J.A. to remain in the regular education classroom at New Middleton with a one-on-one aide or provide J.A. with a behavior intervention plan. (Docket Entry No. 6-1, at pp. 202, 215). Swann also testified that he had never worked with a Down Syndrome child who had a one-on-one aide in a regular education classroom. *Id*. at p. 213. Swann stated that there were discussions at the November IEP meeting about having a behavior plan at CES. *Id*. at p. 215.

Swann testified that although an IEP is typically written for a year long period, it can be revised based upon how the child is doing in class. *Id*. at p. 219. Swann explained that the importance of the IEP including measurable goals is that the goals provide a baseline on how to measure progress. *Id*. at pp. 218-19.

Swann testified that the school system would provide free transportation for J.A. to attend CES at no cost to the parents. *Id*. at pp. 234-35. Swann testified that the class at CES is a special education classroom and has a general education curriculum. *Id*. at p. 239. When asked if he thought a more restrictive setting would be appropriate if J.A. made more or better progress in that setting, Swann answered, "Maybe. Yes. It depends on kid by kid, but, yeah." *Id*. at p. 240. As to conducting a functional behavioral assessment, Swann testified as follows:

> Q. But it's true, is it not, that y'all didn't stop the IEP process and say, let's do the FBA and see how he does in regular ed before we talk about placement in a different setting?

A. That was considered. I guess, at the point of the school year, we had -- we felt like we had this great placement at Carthage Elementary, and that JA would do just awesome there. We could have done a lot of things, but ultimately we felt like we had enough information to make that decision at that point. And rather than go through, you know, three or four more months in the general ed classroom trying those things, we felt like we had enough information to make that decision, and we just knew that he would do well over there.

Q. Okay. So you assumed that a functional behavior assessment would not lead to a different conclusion?

A. Correct.

*Id*. at pp. 243-44.

Swann explained that J.A.'s behavioral issues did not improve very much and, because of the large number of children in his classroom, J.A. was very rarely on task without direct supervision from the staff to be successful in the regular education classroom. *Id*. at p. 246. Swann stated that the long-term goal of putting J.A. in the classroom at CES was to acquire skills to advance to the regular education classroom. *Id*. Swann testified that the District believed that a one-on-one aide would be more restrictive because the aide would be used to "basically hold JA upright, to hold him still, to keep him from being . . . disruptive to other students or engaged, on task, . . . that one-on-one person would be just providing him direct instruction throughout the day . . . . He wouldn't be meaningfully involved in the classroom." *Id*. at p. 247. Swann testified that the District believed it had enough information from the classroom aide and from the special education aide on how J.A. interacted with them in J.A.'s regular pre-K classroom and that J.A. "required basically that one-on-one assistance throughout the day." *Id*. at p. 250. Swann admitted that he did not know if the school ever had a four or five year old with Down Syndrome in the regular education classroom. *Id*. at p. 248.

### 5. Testimony of Lisa Hembree

Lisa Hembree, the special education coordinator with the board of education, testified that she had 32 years of experience teaching CDC resource at every spectrum of special education for seventh to twelfth grade. (Docket Entry No. 6-2, at pp. 272-273, 282). Over those years, Hembree, at times, was brought in to provide special education supports in general education classrooms, which is a part of inclusion. *Id.* at pp. 273-74. However, Hembree had never given special education supports or services to a child with Down Syndrome in a general education classroom and her experience in teaching children with Down Syndrome was limited to teaching them in a special education classroom. *Id.* at p. 279.

In determining whether to assign a child an aide, Hembree testified that the District must look at each child on an individual basis and not just because the child has Down Syndrome. *Id.* at p. 280. Hembree acknowledged that there have been students who have been provided a full day aide in Smith County and that Smith County did not have a policy that would prevent a student from having one. *Id.* at pp. 281-82. Hembree never observed J.A. in the classroom. *Id.* at p. 284. Hembree testified that she believed that J.A. needed to participate in pre-K again at CES and that after nine weeks for the District to see if progress were being made. *Id.* at p. 299.

Hembree also testified that the use of the term "CDC" in the documents regarding J.A.'s placement at CES was incorrect and was not what the District intended as the classroom at CES was not a CDC classroom. *Id.* at pp. 300-02. The CES classroom was a special education classroom with non-disabled children. *Id.* at p. 302. However, Hembree testified that regardless of the CES classroom being classified as a CDC classroom the District made it clear to J.A.'s mother that it was an integrated classroom with typical peers, that is, non-disabled children. *Id.* at pp. 305-06. Hembree did not know of any children with Down Syndrome who are educated in the general

education classroom for the majority of the day.  *Id.* at p. 304.  As for J.A. repeating pre-K, Hembree testified that if an FBA were conducted, part of it would need to be conducted in a classroom and the other part could be conducted over the summer.  *Id*. at p. 314.

### 6.  Dr. Kathleen Whitbread

The State administrative law judge ("ALJ") determined that the testimony of Dr. Whitbread, Plaintiffs' expert witness, would not be "helpful" or "worthwhile," stating that "we're all certainly capable of stipulating that she's going to testify that JA should be in an integrated or general ed classroom with supports."  *Id*. at pp. 261-63.  As a result, Plaintiffs were allowed to submit Dr. Whitbread's report as an offer of proof.  *Id*. at pp. 263, 317; Docket Entry No. 7-3.

### 7.  State Administrative Law Judge's Oral Decision

At the conclusion of the hearing, the ALJ issued an oral decision from the bench, stating, in part, as follows:

> The issue that we are addressing is educating JA in the least restrictive environment with the most educational benefit. . . .  And I don't think there's any real disagreement between the parties that the placement at NMS, without some sort of modification, was not working, so something needed to change. . . .
>
> The petitioners were essentially asking for the placement to remain the same, with the addition of a one-to-one aide. I mean, that accomplished leaving JA in a regular classroom with predominantly non-disabled children, would provide him help with his behaviors. The downside that I could see from that placement was the absence of a special ed teacher, a potentially chaotic environment that may have been contributing to some of his behaviors, and having an adult with him throughout the entire school day could potentially be a more restrictive placement than the alternative. And also, recognizing that a child with an adult caretaker doesn't really help him blend with his classmates.
>
> The alternative that was offered by the school system was the integrated classroom at Carthage Elementary School, where admittedly, there was -- while some, as we have been referring to them, typical  children, it was predominantly children with disabilities. But my understanding is that there was still a regular curriculum, more teachers for fewer children, so while JA would not be -- have a one-to-one aide, there

would be more adults for fewer children, and JA would not be singled out in that classroom as the child that needed the specific adult caretaker. You have a special ed teacher with proven results, a more controlled environment. But also, possibly – well, certainly, a more restrictive environment than where he was at NMS. . . . [C]ertainly the petitioners have suggested, and I know that their expert would testify, that the alternative with the one-to-one aide would be better and the least restrictive.

And in weighing all of this information, I cannot conclude that the school system's alternative, it violates the IDEA. I think it's a tossup, based upon the criteria that I just iterated. I don't think it's, again, in violation of the IDEA. I think it's a reasonable alternative to educating JA in the least restrictive environment available to Smith County.

. . . .

And based upon the testimony that I have heard this morning, and the fact that the appeal was of this current IEP, which we are still in, although for a limited time, I am going to order the functional behavioral assessment, upon JA's return to the school system, obviously. I think that until he's actually enrolled in Smith County, I don't -- I wouldn't assume that there is any impediment to him being enrolled today. And whether or not there's a limitation on getting that done -- the functional behavioral assessment -- in the next 17 days, at least in sufficient time for decisions to be made about the next school year, which would include whether or not he is reenrolled in Pre-K or moves on to kindergarten. I'm not going to make that decision. I think that smarter people than me should be making that decision with the necessary additional information.

I'm also not going to order a one-to-one aide. I think until the functional behavioral assessment is completed and there's an opportunity to review those results and a determination is made -- I understood from Mr. Swann that, you know, behaviors could be related to the size of the classroom and the stimulation in that classroom, or there may be other issues that could be addressed with an aide. And until we have that information, I think it's premature to make a decision about where JA should be educated.

*Id*. at pp. 318-321.

## 8. State Administrative Law Judge's Written Decision

The ALJ's written decision mainly reiterated the ALJ's oral decision. The ALJ found that the "integrated classroom at Carthage Elementary was inappropriately referred to as a Comprehensive Development Classroom (CDC) which typically includes only children with special needs." (Docket Entry No. 7-4, at 4, ¶7). The ALJ found that the District declined to provide a "one-to-aide," but "did agree to conduct a Functional Behavior Assessment (FBA), which was not completed because JA was disenrolled by his parents from the school system in mid-November." *Id.* at 4, ¶ 10. Some of the ALJ's stated legal conclusions were, in part, as follows:

> 8.     Although the one-to-one aide would help manage JA's behaviors in the regular classroom, it would not provide any additional educational benefit, and the stimulation he receives in that environment could be exacerbating his behaviors.
>
> 9.     Notwithstanding the objection from JA's parents, it cannot be concluded that the proposed placement at Carthage Elementary in the integrated classroom was not a reasonable alternative to the regular classroom at NMES with the requested one-to-one aide or in violation of the IDEA.
>
> 10.     The school system based its proposed new placement on the information that it had available after only 3 months of schooling and was willing to undertake additional evaluation of JA's behaviors but was unable to do so when he was disenrolled.
>
> 11.     JA may have remained at NMES during this additional evaluation, as the parents preferred, had JA remained enrolled and taken advantage of the "stay put" provisions of 20 U.S.C. § 1415(j).
>
> 12.     Because the IEP was within 17 days of expiration at the time of the hearing, relief for the disputed IEP is limited to completion of the FBA, agreed to be the school system, as soon as practicable so that a proper placement for JA can be determined for the upcoming school year.

(Docket Entry No. 7-4, at 10, ¶¶ 8-12). The ALJ also ordered the District to "participate in the training offered by the Down Syndrome Association." *Id.* at 11.

## B. SUPPLEMENTAL HEARING IN FEDERAL COURT

## 1.  Testimony of Kellye Martin

Kellye Martin is a regular education teacher as well as a special education teacher and has twelve years of experience teaching pre-K at Carthage Elementary School.  (Docket Entry No. 33, at pp. 10-11, 18-19, 154-55).  There are two types of pre-K classes at CES, "voluntary pre-K" and "Special Needs Pre-K with Typical Peers."  *Id*. at pp. 13-15.  Martin teaches in the "Special Needs Pre-K with Typical Peers," which is a classroom for children who have more difficulty than those in voluntary pre-K and who may need more help with speech, behavior, orthopedic functioning, or anything that may make them more productive or able to learn in a smaller environment.  *Id*. at pp. 14, 15.  Martin's classroom is not a "CDC" classroom where children need more supports and cannot handle a regular classroom for long periods of time.  *Id*. at pp. 14, 15, 32.  Voluntary pre-K is a regular education classroom that may have children with special needs that are lesser than those in Martin's class.  *Id*. at pp. 15, 26.  Martin's curriculum meets State curriculum standards.  *Id*. at p. 151.

Martin's class has eleven children on the roll whereas voluntary pre-K has twenty.  *Id*. at p. 18.  Generally, seven to nine children attend Martin's class per day, as some children come on different days.  *Id*.  Usually, there are two nondisabled children, referred to as typical peers, who attend each day with seven children with special needs.  *Id*. at pp. 19-23.  The same nondisabled children do not attend every day.  *Id*.  Martin has a paraprofessional assisting her in her classroom.  *Id*. at pp. 36, 155.

Martin never taught or observed J.A.  *Id*. at pp. 35-36.  Martin has taught two children with Down Syndrome at CES.  *Id*. at p. 37.  Martin was not aware of any children with Down Syndrome who have been placed into voluntary pre-K at CES.  *Id*.  Martin testified that in 2018 she received

training in teaching Down Syndrome children from Down Syndrome of Middle Tennessee following the May 2018 due process hearing. *Id*. at pp. 39-40.

## 2. Testimony of Kathleen Whitbread

At the supplemental hearing before the Magistrate Judge, Dr. Kathleen Whitbread testified as an expert in educating children with Down Syndrome. *Id*. at pp. 65-66. Dr. Whitbread, a former special education teacher, has been a university professor where she taught at the undergraduate and graduate levels on the topic of the inclusion of Down Syndrome children in general education classrooms. *Id*. at pp. 57-62. Dr. Whitbread's course work included the effective use of paraprofessionals and behavior intervention plans with Down Syndrome children. *Id*. at p. 62.

Dr. Whitbread testified that while every child is unique Down Syndrome children share a common learning profile, such as "memory working memory" issues, delayed speech, and being more successful with visual learning than auditory learning. *Id*. at p. 66. As to helping nonverbal Down Syndrome children communicate, Dr. Whitbread testified that an augmentative and alternative communication device ("AAC"), a somewhat complex touchscreen device similar to an iPad that utilizes pictures and acts as a bridge to help communicate with such children while waiting for their language to develop, may be used. *Id*. at pp. 66-71. Dr. Whitbread testified that she met with J.A. the day prior to the supplemental hearing for an hour and a half and that J. A. operated the AAC device very well and was able to communicate with it. *Id*. at pp. 70-73. Dr. Whitbread did not observe Martin's classroom. *Id*. at p. 124. Dr. Whitbread acknowledged that J.A. was still not completely toilet trained. *Id*. at p. 132.

Because of his age, currently six years old, Dr. Whitbread believed that J.A. should go to kindergarten rather than repeat preschool based on research that shows that there is not a benefit to

18

holding children with Down syndrome back, especially at the pre-K level. *Id.* at pp. 74-75. Dr. Whitbread explained that before age nine the brain is flexible in terms of acquiring new information and that, because most children with Down syndrome have delayed learning, developing early literacy skills as early as possible is important. *Id.* at pp. 75-76. Dr. Whitbread also testified that the IEP for a child in pre-K should have some sort of reading or math goal, which would be consistent with the standards in Tennessee. *Id.* at pp. 77-78.

As to the appropriate role of a paraprofessional in pre-K or kindergarten for a Down syndrome child, Dr. Whitbread testified that a typical role would be to reinforce learning. *Id.* at p. 81. Whether a paraprofessional would be too restrictive in a general education classroom, Dr. Whitbread testified that it was possible, but that it was "typically a training issue." *Id.* at p. 82. Dr. Whitbread opined that if a paraprofessional had proper training then it would be inappropriate to assume that a paraprofessional would be too restrictive for J.A., adding that very young children with Down syndrome often need an extra person, who is properly trained, in the classroom. *Id.* at p. 84.

With respect to creating a behavior intervention plan, Dr. Whitbread testified that behavior is communication and when a Down Syndrome child is exhibiting negative behavior a teacher must figure out what the child is trying to communicate by behaving in that manner. *Id.* at pp. 85-86. Dr. Whitbread explained that a functional behavior assessment attempts to figure out the function behind the behavior by collecting "a lot of data." *Id.* at p. 86. A person must observe over a period of time to determine the event triggering the behavior and then test the behavioral theory. *Id.* at pp. 87-88. Dr. Whitbread testified that the person who collects this data is often the paraprofessional because the aide has more flexibility with time. *Id.* at p. 88. However, just writing down the misbehavior

itself would not constitute a functional behavior assessment as it would only show what behavior was being targeted. *Id.*

As to Cond's list of J.A.'s behaviors, Dr. Whitbread testified that she could not determine what caused the behaviors by just looking at the document because the document only described the behavior without providing the "before data and after data." *Id.* at p. 89. Dr. Whitbread testified that running out of a room, licking things, throwing objects, crying, and lying down on the floor are common behaviors of Down Syndrome children in the pre-K, kindergarten, or sometimes first and second grade range and that J.A.'s behaviors on Cond's list were common with Down Syndrome children. *Id.* at pp. 85-86, 89-90. Dr. Whitbread stated that a functional behavior assessment could be performed for J.A. regarding his misbehaviors, except for the toilet training issue, that a behavior intervention plan would be appropriate, and that a behavior intervention plan could be implemented in a regular education classroom by a properly trained paraprofessional. *Id.* at pp. 89-91, 93-94. Dr. Whitbread opined that without a functional behavior assessment and behavior intervention plan a school would not know the "why of the behavior" and therefore could not move forward to change the behavior. *Id.* at pp. 99-100. Dr. Whitbread also testified that a weighted vest is most commonly used for children with autism, but was unsure why it would be used on J.A. *Id.* at p. 115.

As to the CES classroom, Dr. Whitbread opined that the composition of the classroom would not provide a typical school experience and therefore would not be beneficial, as the makeup of the classroom would not mimic the percentages of disabled and nondisabled children in the community. *Id.* at pp. 103-04, 110. Dr. Whitbread also believed that the class being made up of different children each day would be confusing to a Down Syndrome child. *Id.* at pp. 107, 110. Based upon J.A.'s educational record that she reviewed, her experience with children with Down syndrome, and her

meeting with J.A., and all of the videos she watched of J.A., Dr. Whitbread opined that J.A. could benefit from a regular education classroom and did not see the CES classroom far outweighing the benefits of the general education classroom at NMES. *Id*. at pp. 110-11. According to Dr. Whitbread, any benefit in a smaller classroom could be duplicated in a regular education classroom through small groups or through a "pull out" session where the child goes to a special education teacher for a part of the day or through "push in" where a special education teacher goes into the general education classroom and works individually with the child. *Id*. at pp. 111-13.

Dr. Whitbread testified that one of the main goals of inclusion in general education classrooms is so that a disabled child, particularly one with Down Syndrome, can learn to socialize and conform behavior by observing nondisabled children. *Id*. at p. 114. Dr. Whitbread further testified that given that J.A. did not have a paraprofessional and a behavior intervention plan at New Middleton she did not believe that J.A. should have "stayed put" in the general education class there while the courts figured out where he should be placed because without those supports J.A. did not have what he needed to be successful, which she believed would be a scary experience for a young child. *Id*. at pp. 116-17. Dr. Whitbread explained that based upon her experience and significant research "putting children in settings where there are primarily children with disabilities results in poor outcomes in almost every area that we measure, so [sic] academically and socially." *Id*. at p. 140.

Dr. Whitbread believed that if a paraprofessional were trained, the regular education teacher reviewed J.A.'s records, and a special education teacher provided support, such a structure could be in place within thirty days, whether it was in pre-K or kindergarten. *Id*. at p. 144. Dr. Whitbread stated that such a model is typical for a child with any disability in a regular education classroom.

*Id*. at p. 145. Dr. Whitbread testified that she would make herself available to answer any questions the teachers might have regarding Down Syndrome children and J.A. *Id*. at pp. 144-45.

### 3. Barry Smith

Barry Smith, Smith County's director of schools, testified as to the intense community rivalry, described as "unhealthy," between Gordonsville High School, the community in which NMES is a part, and Smith County High School in Carthage. *Id*. at pp. 162-63, 169. According to Smith, J.A.'s mother telephoned him in the spring of 2017, inquiring about programs available to J.A., and stated that she would be fine with the integrated program if it were in Gordonsville (at NMES), but not in Carthage (at CES). *Id*. at pp. 163-65. Smith testified that he later took J.A.'s mother to visit both pre-K classrooms at CES. *Id*. at pp. 165-66, 179. Smith stated that they spent two to three hours touring the school. *Id*. at p. 166.

Smith testified that following the due process hearing, Talbott provided special education training to some of the District's teachers. *Id*. at pp. 171-72. Smith testified that the term "CDC" should not be used in describing Martin's class and admitted that using that term could be confusing to parents. *Id*. at p. 173. Smith testified that twelve or fifteen years ago Smith County adopted from some other school districts the concept of integrating two nondisabled children with five or seven disabled children. *Id*. at pp. 161, 173-74. Smith acknowledged that a classroom may be better academically, but not be the least restrictive environment. *Id.* at p. 175. Smith testified that a full-time aide could be set up for J.A. at NMES. *Id*. at p. 181.

# III. CONCLUSIONS OF LAW

## A. INJUNCTIVE RELIEF

As stated previously, this action was originally referred to the Magistrate Judge on Plaintiffs' motion for preliminary injunction, but pursuant to Fed. R. Civ. P. 65(a)(2) the parties agreed to advance it to a final hearing on the merits and consolidate it with the hearing. (Docket Entry No. 27; Docket Entry No. 33, at pp. 5-6). In considering whether to grant a preliminary injunction, courts consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (citations omitted). "'Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal.'" *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012) (citation omitted). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987); *Jolivette*, 694 F.3d at 765-66. "Under Federal Rule of Civil Procedure 65(d), an order granting an injunction must (1) state the reasons why it issued, (2) state its terms specifically, and (3) describe in reasonable detail the acts restrained or required." *Gas Nat. Inc. v. Osborne*, 624 F. App'x 944, 948 (6th Cir. 2015). A court must "make specific findings

concerning each of the four factors, unless fewer factors are dispositive of the issue." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997).

## B. IDEA

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, "requires states that receive federal funds for education to provide every disabled child who wants it a 'free and appropriate public education'" or FAPE. *L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 788 (6th Cir. 2018) (citing 20 U.S.C. § 1412(a)(1)(A)). A FAPE includes "special education and related services." 20 U.S.C. § 1401(9). "Special education" "means specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." § 1401(29). "Related services" "means transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." § 1401(26). "A State covered by the IDEA must provide a disabled child with such special education and related services 'in conformity with the [child's] individualized education program,' or IEP." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) (quoting § 1401(9)(D) (alteration in original)). Thus, "[a] focus on the particular child is at the core of the IDEA," and "[t]he instruction offered must be '*specially* designed' to meet a child's '*unique* needs' through an '*[i ]ndividualized* education program.'" *Id*. at 999 (citation omitted and emphasis in original). A FAPE requires that a school prepare an IEP for the disabled student, and "that IEP must provide the FAPE so as to educate the disabled student in the 'least restrictive environment' (LRE) possible." *L.H.*, 900 F.3d at 788 (citing 20 U.S.C. §§ 1414(d)(1)(A) and 1412(a)(1), (5)).

"The IEP is 'the centerpiece of the [IDEA]'s education delivery system for disabled children.'" *Id*. (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988) (alteration in original)). "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 994 (citation omitted). "'[T]he process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome,' and, therefore, the IEP's substantive 'educational benefits' are best measured under the paradigm of 'appropriate progress' based 'on the unique circumstances of the child for whom it was created.'" *L.H.*, 900 F.3d at 788-89 (citations omitted). An IEP team, comprised of "the student's parents or guardian, a school district representative, the student's regular and special education teachers, a person able to interpret the student's results and evaluations, and, when appropriate, the student," "work cooperatively to formulate the IEP." *Id*. at 788; §1414(d)(1)(B). "The IEP must (1) comply with the procedures set forth in the IDEA and (2) be 'reasonably calculated to enable the [student] to receive educational benefits.'" *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982)). "The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. . . . Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 999 (citations omitted) (emphasis in original).

"An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id*. "The IEP must state the student's educational status, the annual goals for the student's education, the special-educational services and aides to be provided to meet those goals, and the extent the student will be 'mainstreamed,' i.e., spend time in school environments with non-disabled students." *L.H.*, 900 F.3d

at 788 (citing § 1414(d)(1)(A)). Particularly, the IDEA requires, among other things, that an IEP include: (1) "a statement of the child's present levels of academic achievement and functional performance" that includes "how the child's disability affects the child's involvement and progress in the general education curriculum" and "for preschool children . . . how the disability affects the child's participation in appropriate activities;" (2) "a statement of measurable annual goals, including academic and functional goals" that enable the disabled "child to be involved in and make progress in the general education curriculum" and that "meet each of the child's other educational needs that result from the child's disability;" and (3) "a description of how the child's progress toward meeting" those goals will be measured. § 1414(d)(1)(A)(i)(I)-(III). The IEP must also include a "statement of the special education and related services and supplementary aids and services . . . to be provided to the child . . . and a statement of the program modifications or supports for school personnel that will be provided" so that the child may "advance appropriately toward attaining the annual goals," "be involved in and make progress in the general education curriculum . . . and to participate in extracurricular and other nonacademic activities," and "be educated and participate with other children with disabilities and nondisabled children in" such activities. § 1414(d)(1)(A)(i)(IV).

The "least restrictive environment" ("LRE") "is a *non-academic* restriction or control on the IEP--separate and different from the measure of substantive educational benefits--that facilitates the IDEA's strong 'preference for mainstreaming handicapped children.'" *L.H.*, 900 F.3d at 789 (citing *Rowley*, 458 U.S. at 181 n.4 (internal quotation marks omitted and emphasis in original)). Section 1412(a)(5) states:

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in

regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

*Id*. However, the preference for mainstreaming is not absolute, as "a school may separate a disabled student from the regular class under circumstances when: (1) the student would not benefit from regular education; (2) any regular-class benefits would be far outweighed by the benefits of special education; or (3) the student would be a disruptive force in the regular class." *L.H.*, 900 F.3d at 789.

As the Sixth Circuit has explained:

In practice, the IEP and LRE generate two different types of decisions. Formulating the IEP's substantive educational benefits most often concerns methodology, such as deciding between alternative programs or methods for educating a disabled student-- these types of decisions require the school district's educational expertise. Establishing the LRE, however, concerns whether, or the extent to which, a disabled student can be mainstreamed rather than segregated and does not require any such educational expertise. Simply put, "[i]n some cases, a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming."

*Id*. (citations omitted).

When disagreement arises between parents and educators concerning a student's IEP, "parents may turn to dispute resolution procedures established by the IDEA." *Endrew F.*, 137 S. Ct. at 994. "[A]ggrieved parents can begin a formal grievance process by submitting a 'complaint' to the school 'with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child.' This triggers a formal meeting among the parents, school officials, and the IEP team." *L.H.*, 900 F.3d at 789 (citing 20 U.S.C. § 1415(b)(6), (f)(1)(B)(i)). The complaint may allege procedural and/or substantive violations. 20 U.S.C. § 1415(f)(3)(E). "Procedural violations generally concern 'the preparation of an IEP,' such as the evaluation, placement, and IEP-formation procedures" provided in § 1414. *L.H.*, 900 F.3d at 789 (citation omitted). "Substantive violations concern the substance of the IEP; namely, whether

the school has provided 'an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *Id.* (citation omitted).

If the preliminary meeting fails to resolve the dispute and if subsequent voluntary mediation either fails or is not tried, the parents may file a "due process complaint" and have a due process hearing before a the State or local educational agency. § 1415(b)(7)(A), (f), (g). In Tennessee, due process hearings are conducted by administrative law judges, employed by the secretary of state, who have received training in special education law and the IDEA, specifically. Tenn. Code Ann. § 49-10-606; 20 U.S.C. § 1415(f)(3)(A). "[A]t the conclusion of the administrative process, the losing party may seek redress in state or federal court." *Endrew F.*, 137 S. Ct. at 994 (citing § 1415(i)(2)(A)). The party challenging the IEP bears the burden of proving by a preponderance of the evidence that the IEP formulated by the school is inappropriate. *L.H.*, 900 F.3d at 790.

On judicial review, a "district court applies a 'modified de novo' standard of review, meaning that it must make an independent decision based on the preponderance of the evidence while also giving 'due weight' to the determinations made by the State ALJ." *Id.* (citations omitted). In reviewing the administrative agency's decision, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 1415(i)(2)(C). The Sixth Circuit has stated:

> The court may not "simply adopt the state administrative findings without an independent re-examination of the evidence," but neither may it "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." As with the deference to school officials on matters of substantive educational methodology, the weight due to the State ALJ's findings depends on whether the finding is based on educational expertise. "Less weight is due ... on matters for which educational expertise is not relevant because a federal court is just

as well suited to evaluate the situation[;] [m]ore weight ... is due to ... determinations on matters for which educational expertise is relevant."

*L.H.*, 900 F.3d at 790 (citations omitted).

In reviewing procedural and substantive violations, a court "must first determine whether the school complied with the IDEA's procedural requirements." *Id*. (citation omitted). Thus, "[t]his is an inquiry into 'the process by which the IEP is produced, rather than [into] the myriad of technical terms that must be included in the written document,' or into mere technical violations, which do not provide a basis for invalidating an IEP." *Id*. (citations omitted). In assessing procedural compliance, an important aspect is "whether there was adequate parental involvement and participation in formulating an IEP." *Id*. "Participation must be more than a mere form; it must be *meaningful*." *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004) (emphasis in original). "A procedural violation can cause substantive harm when it seriously infringes upon the parents' opportunity to participate in the IEP process." *Id*. at 859. If the procedural requirements are satisfied, at the second step, "the court must decide whether the IEP's substantive educational plan was 'reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *L.H.*, 900 F.3d at 790-91 (citations omitted). At the second step, once the procedural requirements are satisfied, the court will grant greater deference to the State ALJ's determinations regarding the substantive analysis. *Id*. at 790.

Upon review of an administrative decision under the IDEA, a court "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). "'[E]quitable considerations are relevant in fashioning relief,' and the court enjoys 'broad discretion' in so doing." *Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 16 (1993) (citations omitted).

## C. ANALYSIS

Plaintiffs assert that the May and November 2017 IEPs do not deliver FAPE because they lack the necessary academic goals and the necessary supports for success, and that without these, CES cannot be considered the least restrictive environment for J.A. (Docket Entry No. 36, at 44). Plaintiffs assert that although the ALJ found no IDEA violation, the ALJ actually awarded much of the relief the Plaintiffs' were seeking: (1) a functional behavior assessment "be completed as soon as practicable;" (2) and then "a proper placement be determined;" and (3) the school system to participate in the training offered by the Down Syndrome Association. (Docket Entry No. 1, at ¶ 59). Plaintiffs contend that the ALJ found that the behavioral supports were necessary and could have been delivered at NMES, but incorrectly found that this did not happen because the parents did not take advantage of "stay put" under 20 U.S.C. §1415(j). (Docket Entry No. 7-1, at 6). Plaintiffs contend that instead of applying the correct law for least restrictive environment the ALJ improperly denied J.A. a paraprofessional and improperly used a "reasonable alternative" test for least restrictive environment. *Id*. at 7. Plaintiffs cite that the ALJ acknowledged that CES was more restrictive, yet incorrectly found that it was a "reasonable alternative." (Docket Entry No. 33, at p. 215). Plaintiffs argue that although the ALJ apparently agreed with Plaintiffs that a change of placement could not occur without first affording the necessary supports and services in regular education, the ALJ, nevertheless, found no IDEA violation. (Docket Entry No. 7-1, at 12).

Thus, Plaintiffs assert two related claims under the IDEA: "(1) denial of a free appropriate public education (FAPE) for an inappropriate IEP; and (2) denial of least restrictive environment (LRE)." (Docket Entry No. 36, at 28). Plaintiffs categorize these claims under three subcategories: (1) procedural violations of the IDEA, (2) substantive FAPE violations, and (3) denial of LRE. With

respect to the procedural violations, Plaintiffs contend that Defendant inappropriately (1) predetermined, without any data, that an aide would be overly restrictive in regular education, and (2) misled them about the nature of the placement. *Id.* at 34. As to the substantive FAPE claims, Plaintiffs contend that J.A.'s IEP (1) lacks meaningful academic goals, (2) lacks appropriate behavioral supports, and (3) lacks the support of a paraprofessional. *Id.* at 28.

In response, Defendant contends that, because J.A. is no longer enrolled at NMES and his IEP for school year 2017 to 2018 has since expired, this action is moot and no longer justiciable. (Docket Entry No. 37, at 20). Defendant further argues that it did not violate the IDEA and that the appropriate placement for J.A. under the law is at CES, which will give J.A. the opportunity to learn in a calm and quieter setting with typical peers from which he can model his behavior and allow him to "learn[] how to learn." (Docket Entry No. 33, at pp. 213-14). Defendant asserts that the ALJ's use of the words "reasonable alternative" was not used as establishing an illegal standard for special education cases, but rather the phrase was merely an explanation of what the law and cases already say; i.e., regular classroom settings are preferred to the "maximum extent appropriate." (Docket Entry No. 37, at 27).

### 1. Justiciability

"Under Article III of the Constitution [a court] may only adjudicate actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). "A federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue. A case becomes moot 'when the issues presented are no longer live or parties lack a legally cognizable interest in the outcome.'" *Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513, 530 (6th Cir. 2001) (citations and internal quotation marks omitted). Thus, "a case becomes moot only

when subsequent events make it absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Id*. at 530-31 (citation omitted).  The party asserting mootness carries a heavy burden of demonstrating mootness.  *Id*. at 531.

However, "'if there is a reasonable likelihood that [plaintiffs] will again suffer the deprivation of . . . rights that gave rise to this suit,' the court may exercise jurisdiction and resolve the issue." *Woods v. Northport Pub. Sch.*, 487 F. App'x 968, 980 (6th Cir. 2012) (quoting *Honig*, 484 U.S. at 318).  Therefore, claims "are not moot if the conduct . . . originally complained of is 'capable of repetition, yet evading review.'"  *Honig*, 484 U.S. at 318 (citation and internal quotation marks omitted).  The "capable of repetition, yet evading review" doctrine applies where "'(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.'"  *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (citations omitted).

"[T]he measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date."  *Fuhrmann on Behalf of Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993).  Parents may "'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials,'" although they do so at their own financial risk.  *Carter*, 510 U.S. at 15 (citation omitted); *James ex rel. James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764, 770 (6th Cir. 2000) ("Even after unilaterally withdrawing their son, they could have requested a due process hearing on the adequacy of the IEP.").  "It is residency, rather than enrollment, that triggers a district's IDEA obligations."  *Woods*, 487 F. App'x at 979; 20 U.S.C. § 1412(a)(1)(A).

As the Sixth Circuit has noted, "'[a] placement and an IEP cover an academic year, a nine[-]month period. The Supreme Court has observed that administrative and judicial review of an IEP is ponderous and usually will not be complete until a year after the IEP has expired.'" *Id*. at 980 (quoting *Jenkins v. Squillacote*, 935 F.2d 303, 307 (D.C.Cir. 1991) (internal quotation marks and citations omitted)); *see Woods*, 487 F. App'x at 980; *L.H.*, 900 F.3d 779 (addressing placement of child years removed from IEP); *Hudson v. Bloomfield Hills Public Sch.*, 108 F.3d 112, 113 (6th Cir. 1997) (finding case was not moot where the student "remains eligible for and interested in enrollment in the school district."); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1041 (5th Cir. 1989) (case not moot as "whether and to what extent to mainstream Daniel will be an issue every time [Defendant] prepares a new placement or IEP or proposes to change an existing one"); *A.A., by & through his Parents & Next Friends, E.A. & M.A. v. Walled Lake Consol. Sch.*, No. CV 16-14214, 2017 WL 2591906, at *8-9 (E.D. Mich. June 15, 2017) (finding no mootness where the issue on mainstreaming would remain an issue every time the district prepared an IEP for the student or proposed to change an existing one; the length of time for administrative and judicial review of the dispute; and the student remained eligible for, and interested in, special education services in the District).

Here, the proper placement of J.A., a child with Down Syndrome, is a recurring issue. Defendant agreed to conduct a functional behavior assessment on J.A., but after his placement at CES. The record also reflects that Emmerson Stockton stated that Smith County does not provide a full day aide for any children and that Lisa Hembree and Eric Swann testified that they had never seen or had experience with a child with Down Syndrome included in the regular education classroom in Smith County for a majority of the day. Defendant never provided J.A. with a one-on-

one aide.  Defendant maintains that J.A.'s proper placement should be in the special education classroom at CES.  J.A. also remains eligible for and interested in enrollment in the school district. Accordingly, based upon this record and recognizing the reality that administrative and judicial review of an IEP will not usually be complete until a year after an IEP has expired, the Magistrate Judge concludes that this action is not moot as the issue of mainstreaming will remain in dispute and therefore capable of repetition, yet evading review.

### 2. Procedural Violations

### a. Predetermining the Lack of an Aide

Plaintiffs first contend that Defendant improperly predetermined, without any data, that an aide would be overly restrictive in regular education.  At the administrative hearing, as to Plaintiffs' predetermination claim, the ALJ questioned if that claim did not fundamentally go to the question of whether or not the IEP was appropriate and the child's appropriate placement."  (Docket Entry No. 6-1, at p. 16).  In response, Plaintiffs cited *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004).  *Id*.

In *Deal*, the school system would not offer a child with autism the service of applied behavioral analysis.  *Id*. at 857.  The Sixth Circuit noted that the facts reflected that the school system had an unofficial policy of refusing to provide one-on-one applied behavioral analysis programs and that school system personnel therefore did not have open minds and were not willing to consider the provision of such a program.  *Id*. at 858.  The Court held:

> The evidence reveals that the School System, and its representatives, had pre-decided not to offer Zachary intensive [applied behavioral analysis ("ABA")"] services regardless of any evidence concerning Zachary's individual needs and the effectiveness of his private program. This predetermination amounted to a procedural violation of the IDEA. Because it effectively deprived Zachary's parents of

34

> meaningful participation in the IEP process, the predetermination caused substantive harm and therefore deprived Zachary of a FAPE.

*Id*. at 857.

The Court found that the district court erred in assuming that just because the plaintiffs were present and spoke at various IEP meetings, they were thus afforded adequate opportunity to participate, explaining that such participation must be more than a mere form--it must be "meaningful." *Id*. at 858. The Court stated that despite the plaintiffs' protestations, the school system never treated a one-on-one ABA program as a viable option and concluded that "[w]here there was no way that anything the [plaintiffs] said, or any data the [plaintiffs] produced, could have changed the school system's determination of appropriate services, their participation was no more than after the fact involvement." *Id*.

"To avoid a finding of predetermination, there must be evidence the state has an open mind and might possibly be swayed by the parents' opinions and support for the IEP provisions they believe are necessary for their child." *R.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1188 (11th Cir. 2014) (citing *Deal*, 392 F.3d at 858). Here, the record reflects that Emmerson Stockton, the director of special education, stated that no student in Smith County had a full day aide and that Eric Swann, Smith County's school psychologist, stated that the District was "100% on board" with an FBA and a behavior plan and open to training, but that a line would be drawn on placement and a one-on-one aide, thus refusing to consider the use of a paraprofessional as being too restrictive. Swann also testified that he had never worked with a Down Syndrome child who had a one-on-one aide in a regular education classroom.

However, Dr. Whitbread testified that the person who collects the data showing the events which trigger a Down Syndrome child's behaviors is often the paraprofessional. Wendy Cond

admitted that there was not any data at the IEP meeting as to how J.A. would perform with a one-on-one aide. Thus, the failure to even consider incorporating the use of a paraprofessional with an FBA would limit the collection of any data Plaintiffs could have collected and produced in order to change the District's determination that a one-on-one aide would be too restrictive. This predetermination not to consider using a paraprofessional because the District believed it was too restrictive amounted to a procedural violation of the IDEA.

Accordingly, for these reasons, the Magistrate Judge concludes that Defendant committed a procedural violation that infringed upon Plaintiffs' ability to participate in the IEP process, which resulted in substantive harm.

### b. Misleading Nature of Placement

Plaintiffs assert that Defendant misled them about the nature of J.A.'s placement at CES that impeded the parents' ability to participate accurately and meaningfully during the IEP process. (Docket Entry No. 36, at 36-37). "In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents child." 20 U.S.C. § 1415(f)(3)(E)(ii)(II). Plaintiffs cite the District's repeated use of the term "CDC" to describe J.A.'s proposed placement at CES. Hembree and Barry Smith testified that the use of the term "CDC" to describe Kellye Martin's class was improper. However, the record reflects that the IEP provided that J.A. would be placed in an integrated self-contained pre-K at CES, that J.A.'s mother visited CES with Smith to observe how the classroom worked, and Hembree testified that the District made it clear to J.A.'s mother that CES was an integrated classroom with typical peers

or non-disabled children.  Plaintiffs did not present any evidence showing that J.A.'s parents were actually confused by the terminology.  While the record reflects a technical violation, Plaintiffs have failed to show that this violation significantly impeded the parents' opportunity to participate in the decisionmaking process or denied them from meaningful participation in the IEP process.  Accordingly, the Magistrate Judge concludes that this claim fails.

### 3.  Substantive FAPE Violations

Plaintiffs assert a claim for the denial of a FAPE for an inappropriate IEP.  Specifically, Plaintiffs contend that (1) the IEP lacks meaningful academic goals; (2) it lacks appropriate behavioral supports; and (3) it lacks the support of a paraprofessional.

### a.  Lack of Academic Goals

In providing a FAPE, the IDEA "demands more" than providing "merely more than *de minimis*" educational benefit to a child with a disability.  *Endrew F.*, 137 S. Ct. at 1001.  "It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the chil's circumstances."  *Id*.  In *Endrew F.*, the Supreme Court stated:

> The IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement.  This reflects the broad purpose of the IDEA, an "ambitious" piece of legislation enacted "in response to Congress' perception that a majority of handicapped children in the United States 'were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to "drop out.""

*Id*. at 999 (citations omitted).

The parties stipulated that the pre-K curriculum consists of reading, writing, language, math, science, social, studies, creative arts, and PE/health.  However, J.A.'s May and November 2017 IEPs did not contain academic goals, but mainly contained fine motor and gross motor skills goals.

Although J.A.'s IEP plan did not contain any academic goals for math, science or social studies, Cond testified that she tried to teach J.A. math, social studies, and science. However, there was nothing in the I.E.P. for charting J.A.'s rate of progress in these subjects. Swann testified that the importance of including measurable goals in the IEP is that the goals provide a baseline on how to measure progress. Dr. Whitbread testified that the IEP for a child in pre-K should have some sort of reading or math goal, which would be consistent with the standards in Tennessee.

The IDEA requires that an IEP include "a statement of measurable annual goals, including academic and functional goals" that enable the disabled "child to be involved in and make progress in the general education curriculum" and that "meet each of the child's other educational needs that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(i)(II). In order to measure effectively J.A.'s academic goals, the District should have included such academic goals in J.A.'s IEP. Accordingly, the Magistrate Judge concludes that Defendant shall rewrite J.A.'s IEP to include appropriate academic goals to better measure J.A.'s progress. *See S.H. v. Rutherford Cty. Sch.*, 334 F. Supp. 3d 868, No. 3:15-cv-0809, 2018 WL 4615990, at *1, 5 (M.D. Tenn. Sept. 26, 2018) (affirming magistrate judge ordering parties to "develop a mutually agreeable Individual Education Plan").

### b. Lack of Appropriate Behavioral Supports

J.A.'s November 20, 2017 IEP reflected that J.A.'s behaviors impeded his learning. However, the parties stipulated that the District did not conduct an FBA on J.A. or provide J.A. with a BIP. The IDEA provides that "[t]he IEP Team shall in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). The ALJ

ordered the District to conduct an FBA on J.A., for a placement to be determined for the following school year, and for the school system to participate in training offered by the Down Syndrome Association. (Docket Entry No. 7-4, at 10-11). Although the ALJ found that the FBA was not initially conducted because J.A. was disenrolled by his parents, *id*. at 4, ¶10, the record reflects that the District was only willing to conduct the FBA until *after* J.A.'s placement at CES, not prior to it. Cond and Swann testified that the FBA would not have been conducted in Cond's classroom at NMES, but rather at CES. Thus, the ALJ erred in finding that J.A. could have remained at NMES during the "additional evaluation" under the "stay put" provision of 20 U.S.C. § 1415(j)[2], *id*. at 10, ¶ 11, as the record demonstrates that the District was unwilling to conduct an FBA at NMES. Dr. Whitbread testified that she did not believe that J.A. should have "stayed put" in the general education class because without a paraprofessional and a behavior intervention plan J.A. did not have what he needed to be successful. In fact, at the administrative hearing, the ALJ stated, "I don't think there's any real disagreement between the parties that the placement at NMS, without some sort of modification, was not working, so something needed to change." (Docket Entry No. 6-2, at p. 318).

As the Supreme Court noted in *Endrew F.*, "[w]hen a child is fully integrated in the regular classroom, as the [IDEA] prefers, what that typically means is providing a level of instruction reasonably calculated to permit advancement through the general curriculum." 137 S. Ct. at 1000 (footnote omitted). Thus, based upon the Supreme Court's analysis in *Endrew F.* and statutory authority, the Magistrate Judge concludes that the ALJ erred in ordering an FBA be conducted and for placement to be determined for the following school year *after* first finding that placement at CES

---

[2]That provision provides, in part, as follows: "[D]uring the pendency of any proceedings conducted pursuant to this section, . . . the child shall remain in the then-current educational placement of the child . . . until all such proceedings have been completed." 20 U.S.C. § 1415(j).

was a reasonable alternative. Accordingly, the Magistrate Judge concludes that an FBA be conducted and a behavioral improvement plan ("BIP") be implemented for NMES. *See S.H.*, 334 F. Supp. 3d 868, 2018 WL 4615990, at *1, 5 (finding the magistrate judge correct "that a BIP [was] a part of the appropriate relief"); *Endrew F. by & through Joseph F. v. Douglas Cty. Sch. Dist. RE 1*, 290 F. Supp. 3d 1175, 1184 (D. Colo. 2018), *appeal dismissed sub nom. Endrew F. by & through Joseph & Jennifer F. v. Douglas Cty. Sch. Dist. Re-1*, No. 18-1089, 2018 WL 4360885 (10th Cir. Apr. 5, 2018) ("The District's inability to develop a formal plan or properly address Plaintiff's behaviors . . . does, under the new standard articulated by the Supreme Court in this case, impact the assessment of whether the educational program it offered to Petitioner was or was not reasonably calculated to enable him to make progress appropriate in light of his circumstances.").

### c. Lack of a Paraprofessional

Plaintiffs contend that the IEP is deficient because it failed to provide J.A. the basis support of a paraprofessional (a 1:1 aide in regular education). (Docket Entry No. 36, at 32). The IDEA provides that a child's IEP include "a statement of the special education and related services and supplementary aids and services . . . to be provided to the child . . . and a statement of the program modifications or supports for school personnel that will be provided for the child to advance appropriately toward attaining the annual goals" and "to be involved in and make progress in the general education curriculum . . . and to participate in extracurricular and other nonacademic activities . . . ." 20 U.S.C. § 1414(d)(1)(A)(i)(IV). The District objected to providing J.A. with a one on one aide in the regular education classroom as being too restrictive. (Docket Entry No. 7-2, at ¶ 10).

The record reflects that the special education teacher at NMES, who worked with J.A. for 30 minutes a day, helped J.A. improve his behaviors. Cond, however, believed a one-on-one aide would be too restrictive, although the District lacked data showing how J.A. would perform with a one-on-one aide. The District believed that J.A. needed something more because an aide would only help in preventing bad behaviors rather than helping him to learn. At the resolution meeting, Stockton stated that Smith County did not provide a full time aide to any child. Swann testified that he had never worked with a Down Syndrome child who had a one-on-one aide in a regular education classroom. However, Hembree testified that some children in Smith County have been provided a full time aide. Hembree stated that she had never given special education supports or services to a child with Down Syndrome in a general education classroom and her experience in teaching children with Down Syndrome was limited to teaching them in a special education classroom. Smith testified that the District could provide a full time aide.

The record also shows that the District's teachers lacked training to deal with Down Syndrome children. Talbott testified that a paraprofessional's role is to help the child be as independent and as successful as possible. Talbott offered to provide such training to the District for free. Further, the ALJ ordered the District to participate in the training offered by the Down Syndrome Association, and since then teachers have received such training. Dr. Whitbread testified that it was possible that a paraprofessional would be too restrictive in a general education classroom, but that if a paraprofessional had proper training then it would be inappropriate to assume that a paraprofessional would be too restrictive for J.A., adding that very young children with Down syndrome often need an extra person in the classroom. Smith testified that a full-time aide could be set up for J.A. at NMES.

Defendant's reliance on *I.L. through Taylor v. Knox Cty. Bd. of Educ.*, 257 F. Supp. 3d 946 (E.D. Tenn. 2017), *aff'd on other grounds sub nom. I.L. by & through Taylor v. Tennessee Dep't of Educ.*, 739 F. App'x 319 (6th Cir. 2018) is inapplicable here. In *I.L.*, the Plaintiff asserted that the lack of a *consistent* paraprofessional violated the IDEA, not that I.L. was not provided a paraprofessional. There, the school system "tried countless supplementary aids and services for I.L.," and I.L. was provided five paraprofessionals in the regular education classroom. 257 F. Supp. 3d at 980-81. Thus, I.L. was provided aides.

Based upon preponderance of evidence, the Magistrate Judge concludes that Plaintiffs have carried their burden and that J.A. should be provided a paraprofessional in his IEP.

### 4. LRE Claim

In *L.H.*, the Sixth Circuit noted the IDEA's strong preference for mainstreaming, citing, "'To the maximum extent appropriate, children with disabilities, ... [must be] educated with children who are not disabled,' and separated 'only when the nature or severity of the disability ... is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.'" *L.H.*, 900 F.3d at 789 (quoting 20 U.S.C. § 1412(a)(5)(A)). "Each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services. The continuum required . . . must [m]ake provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement." 34 C.F.R. § 300.115(a), (b)(2). "Supplementary aids and services means aids, services, and other supports that are provided *in regular education classes*, other education-related settings, and in extracurricular and nonacademic settings, to enable children

with disabilities *to be educated with nondisabled children to the maximum extent appropriate* in accordance with §§ 300.114 through 300.116." 34 C.F.R. § 300.42 (emphasis added).

The preference to mainstream, however, is not absolute. *L.H.*, 900 F.3d at 789. As the Sixth Circuit has stated:

> In some cases, a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming. The perception that a segregated institution is academically superior for a handicapped child may reflect no more than a basic disagreement with the mainstreaming concept. Such a disagreement is not, of course, any basis for not following the Act's mandate. In a case where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act. Framing the issue in this manner accords the proper respect for the strong preference in favor of mainstreaming while still realizing the possibility that some handicapped children simply must be educated in segregated facilities either because the handicapped child would not benefit from mainstreaming, because any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting, or because the handicapped child is a disruptive force in the non-segregated setting. Cost is a proper factor to consider since excessive spending on one handicapped child deprives other handicapped children. Cost is no defense, however, if the school district has failed to use its funds to provide a proper continuum of alternative placements for handicapped children. The provision of such alternative placements benefits all handicapped children.

*Roncker On Behalf of Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983) (citations omitted).

In weighing the exceptions to mainstreaming, a court must be mindful that "'a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming.'" *L.H.*, 900 F.3d at 789 (citation omitted).

Here, the record does not demonstrate that J.A. would not benefit from mainstreaming. Although his goals were heavy on motor skills, J.A. was making appropriate progress on them and was anticipated to complete them by the end of the year. There is no data showing that J.A. could

not benefit from regular education with a paraprofessional and behavior supports as the District failed to provide any of these. Dr. Whitbread testified that J. A. operated the augmentative and alternative communication device very well and was able to communicate with it. Based upon J.A.'s educational record that she reviewed, her experience with children with Down syndrome, and her meeting with J.A., and all of the videos she watched of J.A., Dr. Whitbread opined that J.A. could benefit from a regular education classroom.

As to the second exception, "any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting," Dr. Whitbread opined that the composition of the classroom at CES would not provide a typical school experience and would not be beneficial as the makeup of the classroom would not mimic the percentages of disabled and nondisabled children in the community. Dr. Whitbread also believed that the class being made up of different children each day would be confusing to a Down Syndrome child. According to Dr. Whitbread, any benefit in a smaller classroom could be duplicated in a regular education classroom through small groups or through "pull out" or "push in" sessions. Dr. Whitbread testified that one of the main goals of inclusion in general education classrooms is so that a Down Syndrome child can learn to socialize and conform behavior by observing nondisabled children. Dr. Whitbread explained that based upon her experience and significant research "putting children in settings where there are primarily children with disabilities results in poor outcomes in almost every area that we measure, so [sic] academically and socially." The Magistrate Judge further notes that the ALJ found that placement at CES did not "far outweigh," NMES, describing the issue as a "tossup" and finding placement at CES a

"reasonable alternative." Accordingly, based upon the foregoing, the Magistrate Judge concludes that the second exception does not apply.

Lastly, whether "the handicapped child is a disruptive force in the non-segregated setting," the record shows that the District did not provide J.A. with an FBA and a BIP. The ALJ did order the District to conduct such an assessment, albeit after J.A. had disenrolled, and further ordered training to be provided to the District's teachers. Dr. Whitbread testified that she could not determine what caused J.A.'s behaviors by just looking at Cond's behavioral log because the log only described the behavior without providing the "before data and after data." Dr. Whitbread testified that without a functional behavior assessment and behavior intervention plan a school would not know the "why of the behavior" and therefore could not move forward to change the behavior.

As stated previously, the IDEA has a strong preference for mainstreaming to "the *maximum extent appropriate*" and that disabled children will be separated "*only* when the nature or severity of the disability ... is such that *education in regular classes with the use of supplementary aids and services* cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). Such "supplementary aids and services" are to be provided "*in regular education classes* . . . to enable children with disabilities *to be educated with nondisabled children to the maximum extent appropriate*." 34 C.F.R. § 300.42 (emphasis added). As J.A. was denied an FBA and BIP before being placed at CES, the Magistrate Judge concludes that the third exception is inapplicable. *See Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1206-08, 1216 (3d Cir. 1993) (where eight year old Down Syndrome child with behavioral issues, whose IEP did not provide a plan for addressing his behavioral problems and as a result was placed in a segregated special education class, the Third Circuit concluded, "If the school has given no serious consideration to including the child in a regular

45

class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's mainstreaming directive.").[3]

Accordingly, for the reasons articulated, the Magistrate Judge concludes that Plaintiffs have been successful on the merits of their claims that Defendant improperly predetermined, without any data, that an aide would be overly restrictive in regular education; that J.A. was denied a FAPE because his IEP lacked academic goals, behavioral supports, and a paraprofessional; and that Defendant failed to place J.A. in the least restrictive environment by placing J.A. at CES without data showing he was unable to perform in the regular education classroom with appropriate supports.

Plaintiffs have also shown that J.A. would suffer irreparable injury without an injunction ordering him returned to NMES and for him to receive behavioral assessments and a properly trained paraprofessional, because without an injunction J.A. would be at risk of being segregated to a small special education classroom with limited contact with non-disabled peers. Dr. Whitbread testified that one of the main goals of inclusion in general education classrooms is so that a disabled child can learn to socialize and conform behavior by observing nondisabled children; that without a paraprofessional and a behavior intervention plan at NMES J.A. would not have what he needed to be successful; and based upon her experience and significant research, placing children in settings where there are primarily disabled children results in poor outcomes in almost every area measured.

There is no showing that the issuance of an injunction will cause substantial harm to others. Providing J.A. behavioral supports and a properly trained paraprofessional would assist his

---

[3]Defendant asserts that the community rivalry was the real reason J.A.'s mother did not want J.A. to attend CES, to which Plaintiffs deny. Testimony reflects that J.A.'s mother wanted J.A. in a regular education classroom with an aide. In any event, regardless of whether the community rivalry played a contributing role in the dispute, the record supports the conclusion that the District violated its legal duties under the IDEA.

education in the regular education classroom and help him conform his behavior. The ALJ previously ordered the District to provide training to its teachers and to conduct an FBA. Smith testified that a full-time aide could be set up for J.A. at NMES. Dr. Whitbread testified that she would make herself available to answer any questions any teachers may have regarding Down Syndrome children and J.A.

Finally, the Magistrate Judge concludes that the public interest would be served by the issuance of the injunction as Swann and Hembree testified that they had never seen a Down Syndrome child included with supports or services in the regular education classroom in Smith County for the majority of the day. Moreover, an injunction would further the goal of the IDEA to address "[t]he perception that a segregated institution is academically superior for a handicapped child [which] may reflect no more than a basic disagreement with the mainstreaming concept," and that "[s]uch a disagreement is not, of course, any basis for not following the [IDEA's] mandate." *Roncker*, 700 F.2d at 1063.

Therefore, the Magistrate Judge concludes that J.A. should be placed at NMES with a properly trained paraprofessional and for the District to conduct an FBA and implement a BIP. Further, based upon Dr. Whitbread's testimony that because J.A. is now six years old (and will be seven in August 2019) and research shows that there is no benefit to holding Down Syndrome children back at the pre-K level and, because most children with Down Syndrome have delayed learning and therefore developing early literacy skills as early as possible is important, the Magistrate Judge concludes that J.A. should be placed in kindergarten rather than repeat pre-K.[4]

---

[4]Plaintiffs also sought relief under Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq*., and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 for the denial of least restrictive environment. (Docket Entry No. 1, at 19-20). These claims are pretermitted where least restrictive environment has been found lacking under the IDEA. *L.H.*, 900

## IV. RECOMMENDATION

Accordingly, for these reasons, the Magistrate Judge **RECOMMENDS** that Plaintiffs' motion for preliminary injunction (Docket Entry No. 7) be **GRANTED** and that J.A. be placed in kindergarten at NMES with a paraprofessional properly trained in dealing with Down Syndrome children and for the District to conduct an FBA and implement a BIP.

The parties have fourteen (14) days after being served with a copy of this Report and Recommendation ("R&R") to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 155 (1985).

**ENTERED** this 20th day of December, 2018.

/s/    Joe  B.  Brown
JOE B. BROWN
United States Magistrate Judge

---

F.3d at 784 n.1.