UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

| | |
|---|---|
| **J.A., et al.,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) NO. 2:18-cv-00043 |
| | ) CHIEF JUDGE CRENSHAW |
| **SMITH COUNTY SCHOOL DISTRICT,** | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM OPINION AND ORDER

Pending before the Court is the Magistrate Judge's Report and Recommendation ("R&R") (Doc. No. 38), Smith County School District's ("Smith County") objections to the R&R (Doc. No. 43), and Plaintiffs' response in support of the R&R (Doc. No. 44). For the reasons stated below, Smith County's objections to the R&R will be overruled, and the Magistrate Judge's R&R will be approved and adopted.

## I. Factual Background[1]

This is an action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et. seq.*, brought by B.P., and on behalf of J.A., her 6-year-old son. J.A. has been diagnosed with Down Syndrome and is eligible for special education with Smith County under the category of Developmental Delay. (Doc. No. 7-2 at 1.) J.A. entered the Smith County School System in 2017-2018 calendar year, and discussions between B.P. and Smith County regarding an

---

[1] A detailed factual and procedural background is provided in the Magistrate Judge's R&R. (See Doc. No. 38.) Therefore, because the parties are intimately familiar with the case, the Court provides only a limited factual background as necessary for resolving Smith County's objections.

individualized education program ("IEP") began in April 2017. (Doc. No. 6 at 202.) J.A.'s formal IEP meeting was conducted on May 19, 2017, and, at that meeting, the parties agreed that the IEP would be revisited after the first nine weeks of the school year to determine if adjustment was necessary. (Doc. No. 38 at 2.) Thereafter, J.A. was placed in a regular education classroom at New Middleton Elementary School ("New Middleton") and began preschool there on August 7, 2017. (Id.)

On October 25, 2017, the parties held a follow-up IEP meeting. (Id. at 5.) J.A.'s difficulties with his placement were discussed at this meeting. (Id.) For example, it was reported that J.A. had difficulty with the overwhelming stimuli of the classroom, would roam the school, lick furniture and other students, and was generally unable to control his behavior. (Id.) Smith County proposed moving J.A. to a comprehensive development class ("CDC"), a special education class comprised of both disabled and non-disabled students, located at Carthrage Elementary School ("Carthage"). (Id.) B.P., J.A.'s mother, did not agree with the proposed change in placement and requested that J.A. be provided with a one-on-one aide in the New Middleton classroom so that his behavior could be monitored and improved. (Id.) Smith County declined to offer J.A. a one-on-one aide in the regular classroom environment, determining that it would be too restrictive. (Id. at 6.)

J.A. continued his placement in the regular classroom at New Middleton, and another IEP meeting was held on November 20, 2017, during which Smith County again recommended J.A. be moved to the CDC class at Carthage. (Id.) B.P. reiterated her objection to such a placement because New Middleton was closer and would offer an opportunity for J.A. to imitate the other, non-disabled students. (Id.) B.P. again requested that Smith County provide a one-on-one aide, but Smith County resisted, contending that the aide would only help in preventing J.A.'s bad behaviors

2

rather than facilitate his learning. (Id.) At this meeting, Alecia Talbott, the parents' advocate, recommended that J.A. (1) receive a functional behavior assessment ("FBA"); and (2) the school implement a Behavior Intervention Plan ("BIP"), with reevaluation in February or March. (Id. at 7.)

Shortly thereafter, in early December 2017, B.P. viewed a Facebook video, showing J.A.'s classmates performing a dance routine while J.A., not being assisted by the teacher in participating, stood and watched. (Id. at 10.) As a result, B.P. withdrew J.A. from New Middleton. (Id.) B.P then filed a due process complaint on J.A.'s behalf. (Id. at 8.) At the required resolution meeting, Smith County stated that they were willing to proceed with a FBA, BIP, and other training, but reiterated that: (1) the Carthage elementary staff was more highly trained and experienced; (2) J.A. would receive more attention at the Carthage CDC class; and (3) a one-on-one aide would be too restrictive. (Id.) Smith County "drew a line" on placement and the request for a one-on-one aide. (Id.)

As a result, B.P. requested a due process hearing before an ALJ. (See generally Doc. No. 6.) At the conclusion of the hearing, the ALJ ruled in favor of Smith County, finding that the November IEP, recommending placement in the Carthage CDC, did not violate J.A.'s right to free and appropriate public education ("FAPE"). (Doc. No. 7-4 at 4-10.) The ALJ concluded that: (1) the one-to-one aide would help manage J.A.'s behavior but would not provide additional educational benefit or decrease the classroom stimuli; (2) placement at Carthage was a reasonable alternative; and (3) Smith County based its new placement on available information and was willing to conduct additional evaluations (the FBA) but was unable to because of J.A.'s withdrawal. (Id. at 10.) The ALJ also determined that, because the IEP was within 17 days of

expiration at the time of the hearing, relief for the disputed IEP was limited to completion of the FBA (agreed to by Smith County) so that a proper placement for J.A. could be determined for the upcoming school year. (Id.)

B.P., on behalf of J.A., appealed the ALJ's decision, and the Magistrate Judge held a supplemental hearing. (Doc. No. 38 at 17-23.) After the evidentiary hearing, the Magistrate Judge entered a 48-page R&R, recommending that J.A.'s previously filed Motion for a Preliminary Injunction (Doc. No. 7) be granted and that J.A. be placed in kindergarten at New Middleton with a paraprofessional properly trained in dealing with Down Syndrome children. The Magistrate Judge also recommended that Smith County be required to conduct a FBA and implement a BIP for J.A. (Doc. No. 38 at 1.)

Smith County has filed objections to the R&R, which are detailed below. (See Doc. No. 42.) Having considered the matter *de novo* as required by Rule 72 of the Federal Rules of Civil Procedure, including the record before this Court and the one developed during the administrative proceedings, the Court finds that the R&R appropriately resolves the issues presented and, as such, it will be adopted. Because the R&R will be adopted, the objections thereto (Doc. No. 42) will be overruled, and J.A.'s Motion for Preliminary Injunction (Doc. No. 7) will be granted. Before discussing the specific objections to the Magistrate Judge's recommended resolution, however, a little background on the IDEA helps place Smith County's arguments in perspective.

**II. Background of the IDEA**

The IDEA "offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education' . . . to all children with certain physical or intellectual disabilities." Fry v. Napoleon Cmty. Schs., 137 S.Ct. 743, 748 (2017). An eligible child "acquires a 'substantive

right' to such an education once a State accepts the IDEA's financial assistance," id. at 749, and "school districts receiving funds under the IDEA must establish an IEP for each child with a disability." Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 762 (6th Cir. 2001). A FAPE has two requirements: (1) the school must prepare an IEP for the disabled student; and (2) the IEP must provide the FAPE so as to educate the disabled student in the "least restrictive environment" ("LRE") possible. L.H. v. Hamilton Cty. Dep't. of Educ., 900 F.3d 779, 788 (6th Cir. 2018).

The IEP is "[t]he linchpin of the IDEA." Gibson v. Forest Hills Local Sch. Dist. Bd. of Educ., 655 F. App'x 423, 426 (6th Cir. 2016) (citing Honig v. Doe, 484 U.S. 305, 311–12 (1988)). "Every year, an 'IEP Team' comprising an eligible child's parents, his teachers, a representative of the local educational agency, and, whenever appropriate, the child himself, meets to discuss the child's progress and educational goals." This is formulated into the IEP, which is "a document that evaluates the child's academic achievement and functional performance, as well as his short-term and long-term goals." Id. (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(II), (d)(3)(B)). "The IEP also specifies the services that the school will provide to help the child to accomplish his goals and sets forth the criteria that the IEP Team will use to evaluate the child's progress over the course of the coming year." Id. (citing 20 U.S.C. § 1414(d)(1)(A)(i)(III)–(IV)). The IDEA requires that an IEP be "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982).

The requirement that an IEP be "reasonably calculated to enable the child to receive educational benefits," was addressed by the Supreme Court in Endrew F. *ex rel*. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988 (2017). There, the Court wrote:

> The IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement. See §§ 1414(d)(1)(A)(i)(I)–(IV). This reflects the broad purpose of the IDEA, an "ambitious" piece of legislation enacted "in response to Congress' perception that a majority of handicapped children in the United States 'were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to drop out.'" Rowley, 458 U.S. at 179 (quoting H.R. Rep. No. 94–332, p. 2 (1975)). A substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act.
>
> [F]or most children, a FAPE will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade. Every IEP begins by describing a child's present level of achievement, including explaining 'how the child's disability affects the child's involvement and progress in the general education curriculum." § 1414(d)(1)(A)(i)(I)(aa). It then sets out "a statement of measurable annual goals . . . designed to . . . enable the child to be involved in and make progress in the general education curriculum," along with a description of specialized instruction and services that the child will receive. §§ 1414(d)(1)(A)(i)(II), (IV). The instruction and services must likewise be provided with an eye toward "progress in the general education curriculum." § 1414(d)(1)(A)(i)(IV)(bb).

Id. at 999, 1001. "[T]he process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome," and, therefore, the IEP's substantive "educational benefits" are best measured under the paradigm of "appropriate progress" based "on the unique circumstances of the child for whom it was created." Id.

The "least restrictive means" is a non-academic restriction or control on the IEP—separate and different from the measure of substantive educational benefits—that facilitates the IDEA's strong "preference for 'mainstreaming' handicapped children." Rowley, 458 U.S. at 181 n.4. "To the maximum extent appropriate, children with disabilities . . . [must be] educated with children who are not disabled," and separated "only when the nature or severity of the disability . . . is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." § 1412(a)(5)(A). This preference is not absolute, however, and a school

6

may separate a disabled student from the regular class under circumstances when: (1) the student would not benefit from regular education; (2) any regular-class benefits would be far outweighed by the benefits of special education; or (3) the student would be a disruptive force in the regular class. Roncker v. Walter, 700 F.2d 1058, 1063 (6th Cir. 1983).

Formulating the IEP's substantive educational benefits most often concerns methodology, such as deciding between alternative programs or methods for educating a disabled student—these types of decisions require the school district's educational expertise. McLaughlin v. Holt Publ. Sch. Bd. of Educ., 320 F.3d 663, 673 (6th Cir. 2003). Establishing the least restrictive means, however, concerns whether, or the extent to which, a disabled student can be mainstreamed rather than segregated and does not require any such educational expertise. Roncker, 700 F.2d at 1062. Simply put, "[i]n some cases, a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming." Id. at 1063. Mainstreaming can be, and often is, a contentious issue between the school and the disabled student's parents. L.H., 900 F.3d at 789.

### III. Standard of Review

The district court applies a "modified *de novo*" standard of review, meaning that it must make an independent decision based on the preponderance of the evidence while also giving "due weight" to the determinations made by the State ALJ. Rowley, 458 U.S. at 206; Burilovich v. Bd. of Educ. of Lincoln Consol. Schs., 208 F.3d 560, 565 (6th Cir. 2000). Towards this objective, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 1415(i)(2)(B). The court may not

7

"simply adopt the state administrative findings without an independent re-examination of the evidence," but neither may it "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." Rowley, 458 U.S. at 206; Doe v. Metro. Nashville Pub. Schs., 133 F.3d 384, 387 (6th Cir. 1998). As with the deference to school officials on matters of substantive educational methodology, the weight due to the State ALJ's findings depends on whether the finding is based on educational expertise. McLaughlin, 320 F.3d at 669. "Less weight is due . . . on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation[;] [m]ore weight . . . is due to . . . determinations on matters for which educational expertise is relevant." Id.

**IV. Smith County's Objections**

It is difficult to determine the exact nature of Smith County's objections the R&R. Smith County identifies the "appropriateness" of the Magistrate Judge's placement determination as the basis for its objections. However, the gravamen of Smith County's objections is geared towards the Magistrate Judge's alleged lack of deference to "the opinions of professionals who have spent five days a week with J.A. for nine weeks, as opposed to a run-in, run-out observation and paid-for opinion." (Doc. No. 42 at 7.) Smith County argues that the Magistrate Judge concludes that "what is best for J.A. is to be determined by someone who has been hired to render an opinion for the parents, and that forty-five days of hand on experience with J.A. is not relevant." (Id. at 8.) Moreover, Smith County asserts that:

> Magistrate Brown did not, in fact, give the local educators nor [ALJ] Summers' "greater deference" to the substantive aspects of the IEP proposed by [Smith County]. Judge Summers heard the witnesses who had worked with J.A., and who had discussed his program with his mother, showed her the classroom at Carthage Elementary heard J.A.'s parents testify, and she considered that same law and the same criteria for making the judgment as did Magistrate Brown. In the process the

8

"greater deference" disappeared.

(Id. at 14.) The remainder of Smith County's filing challenges the Magistrate Judge's decision generally and argues that placement in the CDC class at Carthage would provide J.A. with "the best of both worlds." (Id. at 18-20.) Smith County requests that the Court: (1) reinstitute ALJ Summers' decision; (2) order that J.A. be returned to Smith County to complete the FBA and BIP; and (3) order the parties to reconvene to determine J.A.'s abilities so that appropriate personnel can determine an appropriate IEP. (Id. at 21.)

### V. **Analysis**

As a preliminary matter, the Court again notes that Smith County's objections lack specificity. (Id. at 6.) Smith County's filing provides a "Background" heading, under which it summarizes the relevant factual information, and then an "Objections" heading. (Id.) Smith County then provides 16 pages of argument, with no subheadings, and no definitive statements of its objections (i.e., Smith County's first objection is . . .).

When a party files objections to a magistrate judge's report and recommendation regarding a dispositive motion, the district court must review *de novo* any portion of the report and recommendation to which objections are "properly" lodged. Fed. R. Civ. P. 72(b)(3); see also 28 U.S.C. § 636(b)(1)(B) & (C). Only "specific written objections" to the magistrate judge's proposed factual findings and legal conclusions are "proper" under Rule 72(b). Likewise, the applicable statute contemplates *de novo* determination only "of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C) (emphasis added). In conducting its review, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge

with instructions." Fed. R. Civ. P. 72(b)(3).

In this circuit, litigants must file specific and timely objections to a magistrate judge's report and recommendation under 28 U.S.C. § 636(b)(1)(C) in order to preserve the right to appeal a subsequent order of the district court adopting that report. Cole v. Yukins, 7 F. App'x 354, 356 (6th Cir. 2001) (citing Thomas v. Arn, 474 U.S. 140, 155 (1985)). The filing of vague, general, or conclusory objections does not meet the requirement of specific objections and is tantamount to a complete failure to object. Id. (citing Miller v. Currie, 50 F.3d 373, 380 (6th Cir. 1995)). Moreover, "an 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." VanDiver v. Martin, 304 F. Supp. 2d 934, 938 (E.D. Mich. 2004).

A large portion of Smith County's alleged objection consists of general disagreement with the Magistrate Judge's suggested resolution, and, as such, is not an objection that is properly before this Court. See id. To the extent that Smith County objects to the weight and deference the Magistrate Judge provided to the ALJ opinion and the Smith County witnesses' testimony, that objection is considered below. Any other objections buried within Smith County's filing are not considered by the Court. See Emerson v. Novartis Pharm. Corp., 445 F. App'x 733, 736 (6th Cir. 2011) ("[J]udges are not like pigs, hunting for truffles that might be buried in the record.") (citing United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).

As noted, the thrust of Smith County's objection is that the Magistrate Judge gave too much weight to J.A.'s expert, at the expense of: (1) the ALJ's written opinion; and (2) the testimony of Smith County's educators and officials. (Doc. No. 42 at 8-18.) Importantly, as in L.H., Smith County is not arguing that J.A.'s expert was unqualified, which could be framed as a legal

challenge, rather, Smith County is arguing that her testimony was unpersuasive considering the other testimony, which is a challenge to the Magistrate Judge's weighing of the evidence and determination of the facts. See 900 F.3d at 794.

At bottom, Smith Count argues that the Magistrate Judge should have deferred to the opinions of Smith County's teachers and staff because they had spent far more time with J.A. and were more familiar with his abilities, behaviors, and limitations, so they knew best how he should be educated. In L.H., the Sixth Circuit specifically confronted this issue and explained:

> If the law were that a court must defer to the opinions of those who spend the most time with the student and presumably know him best, then there would be no place for experts. Moreover, parents could never prevail because the student's teachers will always spend more time with the student or know the student better than the parents' hired experts. On the other hand, the parents spend more time with the student and know the student better than any teacher. Taking [this] argument to this ultimate end, the district court would actually defer to the student's parents, who surely know the student the best, regardless of any expertise.

See id. Here, the Magistrate Judge recounted testimony from all of the witnesses, both lay (i.e., B.P., Smith County officials and experts) and expert (Dr. Kathleen Whitbread, J.A.'s expert).[2] (Doc. No. 38 at 3-22.) The Magistrate Judge appropriately considered these witnesses' testimony in coming to his decision and carefully balanced the competing testimony. (Id. at 34-38.) The Magistrate Judge also considered the ALJ's oral and written opinion and provided a detailed explanation for his divergent determinations. (Id. at 14-16, 34-48.) Nor was the Magistrate Judge beholden or entitled to merely rely on the ALJ's opinion. Rowley, 458 U.S. at 206 (holding that the court may not "simply adopt the state administrative findings without an independent re-examination of the evidence"). There is simply no basis in the record, beyond mere disagreement

---

[2] The Court is satisfied, as was the Magistrate Judge, with Dr. Whitbread's credentials to render her expert opinion.

11

with his ultimate determination, for concluding that the Magistrate Judge provided improper deference to any witnesses' testimony. Accordingly, the Court is convinced that the Magistrate Judge has considered the relevant factors and reasonably calculated his ruling to enable J.A. to receive the appropriate educational benefits he is entitled to under the IDEA. <u>Endrew F.</u> *ex rel*. <u>Joseph F.</u>, 137 S. Ct. at 999. Smith County's objection will therefore be overruled.

**VI.** <u>**Conclusion**</u>

On the basis of the foregoing and having fully considered the arguments raised by the parties, the R&R is **APPROVED AND ADOPTED**. The Court will issue a separate order setting out the preliminary injunction. Plaintiffs' complaint also requests several other forms of relief, including compensatory damages and reimbursement for expenses. (Doc. No. 1 at 24.) Consequently, this case is **RETURNED** to the Magistrate Judge for further case management, including disposition of these other claims for relief upon dispositive motion.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE